<u>DRAFT</u>

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------- x

| | | |
|---|---|---|
| DEUTSCHE OEL & GAS S.A., | : | |
| | : | Index No. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **COMPLAINT** |
| ENERGY CAPITAL PARTNERS MEZZANINE | : | |
| OPPORTUNITIES FUND A, LP, | : | |
| ENERGY CAPITAL PARTNERS MEZZANINE | : | |
| OPPORTUNITIES FUND, LP, | : | |
| ENERGY CAPITAL PARTNERS MEZZANINE | : | |
| OPPORTUNITIES FUND B, LP, | : | |
| ENERGY CAPITAL PARTNERS MEZZANINE | : | |
| (ALASKA MIDSTREAM CO-INVEST), LP, | : | |
| ENERGY CAPITAL PARTNERS MEZZANINE | : | |
| (ALASKA MIDSTREAM CO-INVEST) II, LP, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------- x

Plaintiff Deutsche Oel & Gas S.A. ("<u>Plaintiff</u>" or "<u>DOGSA</u>"), by and through its undersigned counsel, allege as follows for their Complaint against Defendants Energy Capital Partners Mezzanine Opportunities Fund A, LP ("<u>ECP Fund A</u>"), Energy Capital Partners Mezzanine Opportunities Fund, LP ("<u>ECP Fund</u>"), Energy Capital Partners Mezzanine Opportunities Fund B, LP ("<u>ECP Fund B</u>"), Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP ("<u>ECP Midstream</u>"), and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP ("<u>ECP Midstream II</u>" and together with ECP Fund A, ECP Fund, ECP Fund B, and ECP Midstream, "<u>ECP</u>" or "<u>Defendants</u>").

## <u>NATURE OF THE ACTION</u>

1.      Furie Operating Alaska, LLC f/k/a Escopeta Oil Co., LLC ("<u>FOA</u>") is the operator of the Kitchen Lights Unit, an approximately 83,000 acre development region in the Cook Inlet basin in Southcentral Alaska, which stretches from the Forelands, north towards Anchorage.  FOA,

**DRAFT**

together with its affiliates, Cornucopia Oil & Gas Company, LLC ("Cornucopia") and Corsair Oil

& Gas LLC ("Corsair," and together with FOA and Cornucopia, "Furie"), holds mineral rights that

entitle it to explore and produce crude oil and natural gas from the Kitchen Lights Unit.

2.      Plaintiff invested hundreds of millions of dollars in Furie, obtaining the mineral

rights, drilling exploration and production wells, and building the infrastructure to extract, process,

and sell natural gas.  With this investment, Plaintiff created a business selling natural gas to

customers, including utilities, who entered into long-term supply contracts.  However, that

business was destroyed, and Plaintiff's investment was lost, due to the Defendants' conduct as

detailed herein.

3.      ECP is a group of investment funds focused on energy infrastructure projects that

are jointly controlled by a management team that purports to have deep expertise and extensive

relationships in the energy industry.

4.      Beginning in July 2014, ECP provided debt financing to supplement Plaintiff's

equity investment in Furie.  Thereafter, seizing upon defaults under the loan documents that were

beyond Furie's control, ECP began a spiraling course of conduct, consistently and constantly

threatening to foreclose on Furie if Plaintiff did not cede increasingly greater control over Furie's

operations.

5.      Over the course of the parties' relationship, ECP insisted upon various concessions

that increased Furie's indebtedness to ECP while concurrently giving ECP greater—eventually

total—decision-making authority over Furie's business.  To protect itself from any liability for its

actions, ECP routinely required Plaintiff and Furie to release ECP from any liability for its actions.

6.      Over the next several years, Furie was destroyed by the combination of the

additional debt imposed by ECP and the incompetence of ECP's chosen manager.  Instead of

making prudent choices necessary to responsibly extract hundreds of millions of dollars of proven natural gas reserves from the Kitchen Lights Unit, ECP's proxy manager, Ankura Consulting Group, LLC ("Ankura"), prioritized ECP's interests over the interests of all other stakeholders. As a result of this breach of loyalty, ECP and Ankura made choices that effectively destroyed Furie's business and wiped out the vast majority of the proven-developed-producible (PDP) gas reserves. Under Ankura's mismanagement and gross negligence, the value of Furie's business plummeted from over $650 million to zero, forcing Furie, at ECP's direction, to file for bankruptcy.

7.      When ECP sought, and Plaintiff refused to grant, further releases for their liability, ECP maneuvered Furie into filing petitions under chapter 11 of the Bankruptcy Code so that ECP could orchestrate a sale of Furie without input from Plaintiff. After the bankruptcy petitions were filed, ECP solidified its control over the bankruptcy process by further encumbering Furie with debtor-in-possession financing that imposed milestones to give ECP control over the sale process and attempted to grant ECP the releases that plaintiff refused to grant.

8.      Under ECP's control, the bankruptcy cases will result in the complete loss of Plaintiff's investment in Furie through the confirmation of a plan of reorganization that will extinguish Plaintiff's equity interest in Furie; and had Plaintiff known ECP's intention to wrest control and destroy the value of Plaintiff's equity, it would never have entered into any contractual relationship with them.

## THE PARTIES

9.      Plaintiff is a Luxembourg company with its principal place of business in Luxembourg City. On September 26, 2019, Brutus AG ("Brutus") f/k/a Deutsche Oel & Gas AG ("DOGAG") assigned all of its existing and future claims against ECP to Plaintiff. As part of this

**DRAFT**

assignment, Brutus assigned to Plaintiff the right to assert any and all claims against ECP that Brutus could have asserted against ECP.

10.     Defendant ECP Fund A is a Limited Partnership organized under the laws of Delaware.  Upon information and belief, ECP Fund A's principal place of business is San Diego, California.  ECP Fund A is the Administrative Agent and the Collateral Agent for the Lenders.[1]

11.     Defendant ECP Fund is a Limited Partnership organized under the laws of Delaware.  Upon information and belief, ECP Fund's principal place of business is San Diego, California.

12.     Defendant ECP Fund B is a Limited Partnership organized under the laws of Delaware.  Upon information and belief, ECP Fund B's principal place of business is San Diego, California.

13.     Defendant ECP Midstream is a Limited Partnership organized under the laws of Delaware.  Upon information and belief, ECP Midstream's principal place of business is San Diego, California.

14.     Defendant ECP Midstream II is a Limited Partnership organized under the laws of Delaware.  Upon information and belief, ECP Midstream II's principal place of business is San Diego, California.

**RELEVANT NON-PARTIES**

15.     Brutus is a German company with its principal place of business in Berlin, Germany.  Brutus is the Sponsor and the sole equity holder of FOA.

---

[1] "Administrative Agent" refers to an entity that acts as an agent for a syndicate of lenders in administering the loan facility with the borrower under a loan agreement.  "Collateral Agent" refers to an entity that holds collateral on behalf of lenders under a syndicated loan agreement as security for performance of the borrower's obligations under the loan agreement.

**DRAFT**

16.     FOA is a limited liability company organized under the laws of Delaware with its principal place of business at Anchorage, Alaska.  FOA is the operator of the Kitchen Lights Unit, an approximately 83,000-acre development region comprising thirty-five competitive oil and gas leases in the Cook Inlet off the coast of Southcentral Alaska.  Brutus is FOA's sole member.

17.     Cornucopia is a limited liability company organized under the laws of Delaware with its principal place of business in Anchorage, Alaska.  In October 2010, Cornucopia acquired a majority Working Interest ("WI") in the Kitchen Lights Unit and additional lease acreage in the Cook Inlet.  Cornucopia, whose sole member is FOA, owns 78.999% WI of the Kitchen Lights Unit oil and gas leases.  Furie owns 1% WI and Corsair owns 0.001% WI.

18.     The remaining 20% WI in the oil and gas leases are currently owned by a group of investors comprising of Taylor Minerals, LLC; Danny Davis; and Allen Lawrence Berry.

19.     Corsair is a limited liability company organized under the laws of Delaware with its principal place of business at Anchorage, Alaska.  The sole member of Corsair is FOA.

20.     On August 9, 2019, FOA, Cornucopia and Corsair each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Their cases are pending before the Honorable Laurie Selber Silverstein and are jointly administered under Case No. 19-11781.

## JURISDICTION AND VENUE

21.     Jurisdiction and venue is proper pursuant to General Obligations Law § 5-1402 because ECP irrevocably and unconditionally submitted to the jurisdiction and venue of this Court as part of the Pledge Agreement entered into between Plaintiff and ECP Fund A, as Administrative Agent, on July 15, 2014 (the "Pledge Agreement").  Pursuant to Section 8.12(b) of the Pledge Agreement, any legal action arising out of or relating to the Pledge Agreement may be brought in the courts of the State of New York, in and for the County of New York.  This dispute arises from

and/or relates to the contractual relationship between Plaintiff and ECP.  As set forth herein, ECP's conduct during the contractual relationship served to harm Plaintiff and destroy the value of its pledge of, and interest in, the equity in Furie.

## FACTUAL BACKGROUND

### Furie's Operations in Alaska

22.    Furie was formed in 1999 to derive revenue and profit from selling oil and natural gas produced from the Kitchen Lights Unit in Alaska.  Furie held interests in proven natural gas reserves totaling in excess of 160 billion cubic feet and having a present-day value of at least $1,040,000,000 at $6.50 per million cubic feet.

23.    During the 2000s, FOA acquired additional oil and gas leases in the Cook Inlet, including leases from other independent oil and gas companies. FOA's consolidated oil and gas leases became known as the "Kitchen Unit" production area. In 2009, the State of Alaska approved the expansion of the Kitchen Unit, incorporating two additional exploration units. This consolidated production area is known today as the "Kitchen Lights Unit," the largest, contiguous exploration and production area in the Cook Inlet.

24.    Brutus, sometimes referred to as "the Sponsor", formed FOA and Cornucopia.  The Sponsor also acquired the lease holdings enabling the project and convinced outside investors in Europe to support the project with financing of over $400 million.

25.    Because Alaskan gas historically sells at a significant premium to gas produced in the continental United States, Furie sought to quickly take advantage of the opportunities the Kitchen Lights Unit presented and capitalize on the lucrative leases that Furie held.

26.    To that end, in 2011, Furie brought an offshore oil drilling platform—the Spartan 151 Jackup—managed by Spartan Offshore Drilling LLC, to the Cook Inlet.  Furie used the

DRAFT

Spartan 151 Jackup to drill four exploratory wells and one certified natural gas discovery well, which later became the first production well.

27.      Despite equity funding provided by the Sponsor of approximately $400 million, it became apparent that additional debt or equity funding was needed to support the permitting, construction and installation of the infrastructure necessary for revenue production and the drilling and development of additional production wells.

28.      In July 2014, ECP agreed to extend credit to Cornucopia and FOA in an aggregate principal amount not exceeding $160,000,000 (as subsequently modified and amended, the "ECP Credit Agreement") to help finance construction and installation of an offshore production platform, a subsea pipeline, and an onshore gas processing facility.

29.      This funding supplemented the Sponsor's equity funding for the build-out of infrastructure to bring the lucrative proven natural gas reserves to market.

30.      The parties entered into the ECP Credit Agreement on December 31, 2014.  On March 19, 2015, the parties amended and restated the ECP Credit Agreement to provide FOA and Cornucopia with additional loans.  This financing was intended to facilitate Furie's infrastructure and production expenses and development.

31.      By the end of 2015, Furie had constructed a production platform, subsea pipeline, and an on-shore natural gas processing plant; begun natural gas production; and entered into a gas supply contract with Alaska Electric and Energy Cooperative, Inc. a/k/a Homer Electric Association, Inc. ("Homer"), an electric utility in Southcentral Alaska.  The offshore platform was the first new Cook Inlet production platform installed since 2000, and the new infrastructure allowed Furie to bring a new natural gas field to the market and diversify supply for the Kenai Peninsula, Mat-Su Valley, and Anchorage areas.

<u>**DRAFT**</u>

32.     In 2016, Furie added two additional wells and entered into a gas supply contract with Alaska Pipeline Company a/k/a Enstar Natural Gas Company ("<u>Enstar</u>"), a natural gas transportation utility in Southcentral Alaska.   However, additional costs in connection with existing and planned construction continued to weigh on operations, resulting in various defaults under the ECP Credit Agreement.

<u>**Defendants Exert Undue Influence Over Furie**</u>

33.     From 2016 to 2018, Furie entered into various forbearance agreements with ECP, and made several amendments to the amended and restated ECP Credit Agreement.   The amendments were necessitated by various construction delays and cost overruns that left Furie unable to make certain principal and interest payments due under the terms of the ECP Credit Agreement.

34.     ECP used these amendments to dramatically increase its role in Furie's day-to-day operations.   Remarkably, ECP went so far as to require its approval of all of Furie's expenses, regardless of materiality.   Specifically, for all invoices, Furie's Chief Financial Officer, David Elder ("<u>Elder</u>") would prepare a "Construction Request," which he submitted to ECP.   ECP then had an outside consultant review the Construction Request to opine on whether the charge(s) was/were appropriate, after which ECP would approve or reject the charges.   If ECP rejected a charge, Elder would not pay it.   Adding insult to injury, ECP forced Furie to pay for the entire cumbersome process, including the outside consultants' fees.

35.     Furie was also forced to get approval from ECP before entering into any gas contracts.   Given the rapid pace at which such agreements are negotiated and entered into, being required to have ECP's prior approval impeded Furie's ability to keep up with competitors.

36.     ECP overreached in terms of Furie's operational strategy, too.   When ECP and Furie disagreed about the direction of operations, ECP would threaten foreclosure to get its way.

**DRAFT**

For example, the Sponsor believed that completing a third production well and going through the permitting process to drill and complete a water disposal well—before drilling a fourth production well—was the best operational direction for Furie.  The existing wells were producing a substantial amount of wet gas,[2] and a water disposal well was necessary to facilitate the efficient disposal of that water (as opposed to the very expensive and labor-intensive process of putting the water in barrels and shipping it to the production platform).

37.     Despite the need for a more cost-effective method to dispose of the water generated from the wet gas production, ECP refused to allow the permitting and drilling of a water disposal well.  Instead, ECP insisted on a more expensive plan to drill and complete a fourth production well—a plan that would not solve the water disposal problem.[3]  Faced with pushback from Furie, ECP once again threatened to foreclose.

38.     As a condition of backing off on its foreclosure threat, and to ensure that its directives were carried out, ECP demanded that Furie engage Ankura to serve as interim Chief Operating Officer ("COO"), and PetroTechnical Resources of Alaska, LLC ("PRA") to serve as Furie's engineering and operations advisor.

39.     Upon information and belief, ECP intentionally and maliciously withheld material information from Furie, including the fact that ECP had a preexisting relationship with Ankura, and an understanding with Ankura that ECP would be able to completely manage Furie's

---

[2] "Wet gas" is produced natural gas that contains liquids.

[3] Furie had proposed to complete the third production well, which was required under the Alaska Department of Natural Resources Plan of Development and the Enstar gas supply contract, with $12 million that it had available to complete the well. ECP, however, insisted on providing $35 million of additional debt to drill an additional production well with the hope that an additional well would increase Furie's production of natural gas.  In other words, ECP forced Furie to take money to pursue an unnecessary project, instead of allowing Furie to do something it was required to do pursuant to at least two contracts.  In other words, ECP forced Furie to take money to pursue an unnecessary project, instead of allowing Furie to do something it was required to do pursuant to at least two contracts.

<u>DRAFT</u>

operations through Ankura.  Had Plaintiff known that Ankura would be ECP's proxy, it would never have consented to move forward with Ankura's retention.

40.     Additionally, ECP failed to disclose that Trent Kososki, a Principle of ECP and the ECP Manager on Furie's Board of Managers, had close family relationships with the owner and founder of PRA, Tom Walsh.

41.     Brutus initially protested ECP's demands, and requested the opportunity to engage another entity for the interim COO role.  However, ECP refused this request, ignored its protests, and responded by stating that engaging anyone but Ankura was unacceptable.

42.     Brutus found ECP's heavy-handed and total control of the management and operation of Furie atypical at best—even for a lender like ECP.  Faced with a Hobson's choice of relenting to ECP's demands or sealing Furie's demise, Brutus accepted the forbearance agreements.  Brutus only now knows that ECP was not telling it the whole story.  In particular, Brutus only recently learned about ECP's longstanding and improper relationship with Ankura and PRA.  In light of this, it is no surprise that ECP would not allow Furie to consider alternatives.

43.     Indeed, to ensure that no one could interfere with ECP's control of Furie's operations, the April 12, 2018 amendment and restatement of the ECP Credit Agreement included a negative covenant that prohibited Furie from terminating, amending, modifying, supplementing or waiving Ankura's engagement letter.  ECP also demanded that Furie's operating agreements be amended to include a restriction on the ability of Furie's managers to supervise or terminate Ankura; ECP did this by demanding provisions in the operating agreements that provided that Pinsonnault would have the power and authority to take any and all actions delegated to the Designated Interim Chief Operating Officer.

44.     ECP insisted on this negative covenant and further increased control over Furie's operations to prevent any possibility of Ankura leaving the operations in Alaska and disclosing its relationship with ECP to third parties.

45.     On April 12, 2018, the Credit Agreement was amended to provide that any time the person serving as the ECP-appointed Manager of Furie was required or permitted to take an action, to vote, or make a decision, then he/she "shall be entitled to consider only such interests and factors, including its own, as it desires and shall have no duty or obligation to consider any other interests or factors whatsoever."

46.     Through these maneuvers, ECP gained the power to dictate who to hire as operators and COO, over Plaintiff's objections.  Ankura, which acted, and continues to act, as ECP's proxy, gained virtually total control over Furie's operations.

**ECP, Through Ankura, Mismanages Furie**

47.     Immediately after Ankura assumed operational control of Furie, Furie's operating expenses increased dramatically.  Pinsonnault engaged several Ankura personnel and transferred several free or low-cost duties performed by contractors (including travel and permitting) to high-priced Ankura departments and consultants.  Despite the fact that Furie was having financial problems, Pinsonnault's first course of action was to spend Furie's money on expensive and unnecessary purchases, such as logoed shirts, coats, and hats, and new state-of-the-art Apple MacBook Pro laptops.  Against specific instructions from the Board of Managers, Pinsonnault also engaged a second and higher-priced law firm, Norton Rose Fulbright LLP, even though Furie had existing counsel, Stoel Rives LLP, that had local experience and institutional knowledge regarding Furie's business.  Ankura demonstrated complete recklessness when spending Furie's money.

48.     Ankura's reckless expenditures did not translate into more profitable operations or increased gas production.  To the contrary, these excessive costs, at least in part, forced Furie to

<u>DRAFT</u>

borrow even more money from ECP to complete the proposed work on the new well (the very same well that ECP insisted on developing, over Plaintiff's objections). Indeed, Ankura went to ECP for a $15 million supplement to the original $35 million ECP loan for the project—grossly exceeding the approved budget and blowing the project timeline. The proceeds of these two loans were quickly consumed through Ankura's mismanagement, by and through Pinsonnault and his grossly negligent operations.

49.     To compensate for Furie's substantial expense increases, Ankura tried to increase gas production from Furie's new and existing wells. That effort only increased the amount of water extracted with the gas and led to the mechanical failure of the geological formation from which Furie was extracting the gas, resulting in the loss of over 100 billion cubic feet of gas reserves worth hundreds of millions of dollars.

50.     On information and belief, these reckless efforts were also conducted for Pinsonnault's personal gain. Specifically, Pinsonnault, who stood to collect a $65,000 bonus when production rates were above a specific level, made decisions not to benefit Furie in the long run, but for his immediate personal gain. In short, Ankura's inept and greedy management, aided and abetted by PRA's incompetence, such as the improper positioning of the packer in the A-4 well, the flawed method applied to bringing the A-4 well to production, and the flawed completion of the A-1 well, all at the insistence and direction of ECP, decimated the proven producible reserves in the Kitchen Lights Unit.

51.     To make matters worse, Ankura decided to use the Spartan 151 Jackup drilling rig to drill the KLU A-4 well. Ankura did so over strenuous objections from the Sponsor, Brodsky (the independent board manager), Bruce Webb, and others, because the Spartan 151 was then

<u>DRAFT</u>

located far away from Furie's operations and had been cold stacked[4] for several years. Moreover, in order to use it, the Spartan 151 required millions of dollars in repairs and the renewal of virtually every state and federal permit required to operate it.

52.     The commercially reasonable decision would have been to use the Randolf Yost jackup drilling rig, located only six miles from the Kitchen Lights Unit, which had drilled wells at the Furie platform in the past and had been warm stacked[5] with a crew since the last Kitchen Lights Unit wells were drilled in 2016. The Randolf Yost needed substantially fewer repairs and was current on most of its state and federal permits, as compared to the Spartan 151.

53.     The use of the Randolf Yost rig would not only have been more appropriate and less costly, but it would have resulted in faster mobilization and installation at the platform, and provided for safer operations.

54.     In evaluating which rig to use, the Spartan 151 or the Randolf Yost, Pinsonnault presented the Board of Managers with bid figures that had purportedly been provided by Blake Drilling, a Louisiana-based finance group that was looking to get involved with jackup drilling rigs. Blake Drilling proposed to operate the Randolf Yost rig.

55.     However, Elder and Pinsonnault inaccurately presented Blake Drilling's bid figures and made the Spartan rig appear less expensive. Yet when the Sponsor reviewed Blake's bid and

---

[4] Also referred to as 'mothballing,' cold stacking is a cost reduction step taken when a rig's contracting prospects look bleak or available contract terms do not justify an adequate return on the investment needed to make the unit work ready (e.g., repairs or refurbishment). Cost savings primarily come from crew reductions to skeletal levels. With the costs of crewing up, inspection, deferred maintenance, and potential refurbishment acting as deterrents to reactivation, cold-stacked rigs may be out of service for extended periods of time. A return to service can be a costly proposition, often requiring tens of millions of dollars for refitting costs.

[5] 'Warm stacked' status means that a rig is idle but operational. A warm stacked rig typically retains most of its crew and can deploy quickly if an operator requires its services. In a warm stacked state, normal maintenance operations similar to those performed when the rig is active are continued by a crew so that the rig remains work ready.

<u>DRAFT</u>

confronted Pinsonnault about the discrepancies, Pinsonnault dismissed such discrepancies as clerical errors.

56.     The Spartan Offshore Drilling contract that Ankura negotiated with Spartan Drilling required that Furie cover the costs of all necessary repairs and reauthorizations. Specifically, in presenting the contract to the Board of Managers, Pinsonnault suggested that fees would be capped at $2.4 million.  However, the agreement that Ankura negotiated stated that the $2.4 million cap only applied during the premobilization period, the period prior to the rig being mobilized from Seward, Alaska for drilling in the Cook Inlet.  After the premobilization period, when the rig had left Seward, all costs, including any repair costs, would be Furie's responsibility.

57.     During various Board of Managers meetings, Rieck repeatedly objected to Pinsonnault's intention to execute the Spartan contract.  During the debate, Brodsky intervened, stating that Ankura's engagement letter clearly stated that if a conflict arose between the Ankura interim COO (Pinsonnault) and the Board of Managers, the Independent Manager (i.e., Brodsky) would make the decision.  However, Pinsonnault refused to comply with the terms of Ankura's engagement letter, and Pinsonnault executed the Spartan contract the next day.

58.     Pinsonnault's refusal to follow the express provisions of the agreement governing Ankura's engagement, as well as the directives of the Board of Managers, was a blatant dereliction of his duties and a breach of the engagement letter by Ankura.  Pinsonnault's actions cost Furie millions of dollars in unnecessary costs and produced delays during the extremely short drilling season—delays and costs that had a direct impact on the Sponsor.

Ankura Demonstrates its Lack of Knowledge in Drilling and Operating Wells

59.     Ankura also grossly mismanaged the drilling, completion, and operation of wells. As noted above, Pinsonnault's desire to extract as much gas as quickly as possible resulted in

<u>DRAFT</u>

significant water production from the formation.  With water production at these levels comes the well-known risk of hydrate buildup in the pipeline.  Under normal circumstances, a prudent operator would use methanol injections to control the buildup of hydrates in the pipeline.

60.     However, under Pinsonnault's supervision, Furie used insufficient methanol injections.  This, combined with drilling fluids, barite, and sand being pumped directly into the 15-mile subsea pipeline, resulted in blockages in the pipeline and the formation of hydrates.  Ankura's malfeasance and gross negligence in this regard shut down production for two full months.  This had a massive impact on Furie because it entirely eliminated Furie's sole source of revenue from January 5, 2019 to March 20, 2019.

61.     The lack of gas production because of the pipeline shutdown forced Furie's largest and most lucrative gas purchase customer, Enstar, to seek alternate suppliers and, ultimately, to renegotiate their gas sales contract with Furie.  Pinsonnault, in a transparent attempt to cover his own incompetence, sought to salvage the original Enstar contract by claiming the blockage was a *force majeure*, but Enstar—a natural gas pipeline company and operator of thousands of miles of pipeline—rejected this outlandish claim.  Indeed, M&H Engineering, the company that designed the Furie platform and pipeline, concluded that the pipeline blockage was avoidable and a result of Ankura's—and more specifically, Pinsonnault's—inexperience.  In the end, both Enstar and Homer elected not to renew their contracts with Furie.

62.     It was only after ECP permitted the Sponsor to intervene that the pipeline was cleared, resulting in the flow of gas in March 2019 and, thereafter, the resumption of revenue.  But, rather than informing Furie's customers after Plaintiff fixed the blocked pipeline, Pinsonnault instead went to the media, demonstrating a confounding disregard for Furie's customers.

DRAFT

63.    Indeed, Homer's General Manager emailed Pinsonnault after the blockage was cleared, noting "I am very disappointed I had to hear the news from my attorney in a Board meeting yesterday.  His source of information was Petroleum News.  I cannot adequately describe my disappointment about the lack of professionalism demonstrated to HEA….  The fact that you or your staff could not take the time to notify HEA representatives prior to making a public news release is astounding to say the least."  Ankura's decision to prioritize its own publicity over customer relations not only resulted in reputational harm to Plaintiff, but to lost revenue and profits as well.

64.    ECP installed Ankura at Furie with Ankura promising production of 44,000 million cubic feet (mcf) of natural gas per day, and that it would save the Enstar contract from termination. Instead, Ankura quickly turned Furie into an unsalvageable mess worth a fraction of the value before ECP and Ankura took over, but only after Ankura and PRA paid themselves millions of dollars in fees and, ultimately, achieved nothing.

**Ankura and ECP Unilaterally Benefit at Furie's Expense**

65.    Despite Ankura's gross negligence and incompetence, ECP has repeatedly rejected the Sponsor's demands that Ankura be terminated.  Instead, ECP informed the Sponsor that ECP would foreclose on FOA, Cornucopia, and Corsair membership interests, unless the Sponsor agreed to place Furie into Chapter 11 bankruptcy and run a process under Ankura's direction—a process that could only benefit itself.[6]  On August 9, 2019, Furie filed for bankruptcy in Delaware bankruptcy court.

66.    Since being retained, and despite the grossly negligent manner in which they have operated Furie, Ankura and Pinsonnault have received more than $5 million under the terms of

---

[6] Forcing Furie into bankruptcy instead of foreclosure was also a transparent effort by ECP to avoid liability and responsibility for any environmental cleanup duties under Alaskan law.

<u>DRAFT</u>

their engagement.  And they continue to serve in that role, giving ECP the ability to exercise total dominion over Furie.  Everything Furie does is by or through ECP's design and direction—there is no financial decision implemented, operational change effected, person or entity hired or fired, or step in the bankruptcy taken, without ECP's direction or approval.

<b><u>FIRST CAUSE OF ACTION</u></b>
<b>(Gross Negligence)</b>

67.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs 1–66 as if fully set forth herein.

68.     As Defendants positioned themselves to gain operational control of Furie, they had a duty to behave reasonably when making decisions in connection with the Kitchen Lights Unit.

69.     Defendants failed to exercise a reasonable level of care when making decisions in connection with the Kitchen Lights Unit, including but not limited to, their insistence on maintaining Ankura and Pinsonnault's retention to oversee Furie's operations even after they displayed a shocking degree of incompetence and mismanagement.  Instead, their decisions led to Furie's bankruptcy.

70.     Defendants' failure to exercise a reasonable level of care caused Plaintiff's current financial losses.

71.     As a result of Defendants' gross negligence, Plaintiff has suffered harm, including, but not limited to, damages, in an amount to be determined at trial.

<b><u>SECOND CAUSE OF ACTION</u></b>
<b>(Fraudulent Inducement)</b>

72.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs 1–66 as if fully set forth herein.

73.     Defendants failed to disclose material facts to Plaintiff when negotiating various transactions and operational decisions; the most detrimental being to induce Plaintiff to approve the engagement of Ankura and enable ECP to exercise total control over Furie.

74.     Specifically, ECP made misrepresentations and omitted material information about its relationship with Ankura and its desire that Ankura be engaged to oversee Furie's operations.

75.     Plaintiff justifiably, reasonably, and foreseeably relied upon Defendants' fraudulent misstatements and omissions and, as a result, agreed to retain Ankura.

76.     After reasonably relying on Defendants' fraudulent misstatements and omissions, Plaintiff was unable to properly manage Furie and Plaintiff was irreparably harmed.

77.     Ankura's mismanagement and incompetence, facilitated and directed by ECP, drove Furie into bankruptcy.

78.     As a result of Defendants' fraudulent conduct, Plaintiff has suffered harm, including, but not limited to, damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Civil Conspiracy to Commit Fraud)**

79.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs 1–66 as if fully set forth herein.

80.     Defendants made false statements of material fact to Plaintiff, and failed to disclose material facts to Plaintiff, to induce Plaintiff to approve the engagement of Ankura and enable ECP to exercise total control over Furie.

81.     Defendants worked alongside other entities and individuals, including, but not limited to, Ankura, PRA, Elder, and Pinsonnault, to unlawfully dominate and control Furie—driving Furie to insolvency and bankruptcy.

DRAFT

82.     Defendants played a significant role in this civil conspiracy, and made statements to Plaintiff in furtherance of the conspiracy.

83.     As a result of Defendants' conduct, Plaintiff has suffered harm, including, but not limited to, damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

84.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs 1–66 as if fully set forth herein.

85.     Defendants engaged in the above stated conduct, which served to withhold from Plaintiff the benefit of the parties' contractual relationship.

86.     Specifically, Plaintiff entered into a pledge agreement under the assumption that all parties were acting in good faith whereas Defendants entered into the contractual agreement knowing they were going to destroy the value of Plaintiff's pledge and equity in Furie.

87.     As set forth above, Defendants' material omissions were part of a broader scheme to wrest control of Furie and strip their investment of liabilities; to the detriment of Plaintiff.

88.     As a result of Defendants' conduct, Plaintiff has suffered harm, including, but not limited to, damages, in an amount to be determined at trial.

*[Remainder of page intentionally left blank.]*

**DRAFT**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of

Plaintiff as follows:

a.      For compensatory damages in an amount to be determined at trial;

b.      For punitive damages in an amount to be determined at trial;

c.      For all interest permitted by law;

d.      For all attorneys' fees and costs permitted by law; and

e.      For such other and further relief as this Court deems just and proper.

Dated: New York, New York
        _____ __, 2020

**REED SMITH LLP**

By:_____DRAFT_____
        Christopher W. Healy
        C. Neil Gray
        Spencer D. Wein
        Talia N. Fiano
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

*Attorneys for Plaintiff*
*  Deutsche Oel & Gas S.A.*