UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/30/2020

---

DEUTSCHE OEL & GAS S.A.,

                    Plaintiff,

       v.

ENERGY CAPITAL PARTNERS
MEZZANINE OPPORTUNITIES FUND A,
LP; ENERGY CAPITAL PARTNERS
MEZZANINE OPPORTUNITIES FUND,
LP; ENERGY CAPITAL PARTNERS
MEZZANINE OPPORTUNITIES FUND B,
LP; ENERGY CAPITAL PARTNERS
MEZZANINE (ALASKA MIDSTREM CO-
INVEST), LP; and ENERGY CAPITAL
PARTNERS MEZZANINE (ALASKA
MIDSTREAM CO-INVEST) II, LP,

                   Defendants.

No. 19-CV-11058 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Deutsche Oel & Gas S.A. ("DOGSA") filed this action in the Supreme Court of

New York, alleging that Defendants Energy Capital Partners Mezzanine Opportunities Fund A,

LP; Energy Capital Partners Mezzanine Opportunities Fund, LP; Energy Capital Partners

Mezzanine Opportunities Fund B, LP; Energy Capital Partners Mezzanine (Alaska Midstream

Co-Invest), LP; and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP

(collectively, "ECP"), mismanaged an oil and gas company and drove it to file for Chapter 11

bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Delaware

Bankruptcy Court").  ECP timely removed the action to federal court, asserting that the action

falls within the Court's bankruptcy jurisdiction under 28 U.S.C. § 1334(b), and simultaneously

moved to transfer the action to the United States District Court for the District of Delaware for

automatic referral to the Delaware Bankruptcy Court pursuant to 28 U.S.C. §§ 1404(a) and 1412. Soon thereafter, DOGSA filed a motion to remand the action to the Supreme Court of New York pursuant to 28 U.S.C. § 1447(c) for lack of bankruptcy jurisdiction.  For the reasons that follow, Plaintiff's motion to remand is denied and Defendants' motion to transfer is granted.  The Court thus transfers this action to the United States District Court for the District of Delaware for automatic referral to the Delaware Bankruptcy Court.

## BACKGROUND[1]

Furie Operating Alaska, LLC, together with certain of its affiliates (collectively, "Furie") is a Delaware limited liability company that holds mineral rights to explore and produce crude oil and natural gas in a development region in Southcentral Alaska.  Dkt. 21-2 ("Draft Compl.") ¶ 1.  Plaintiff invested hundreds of millions of dollars in equity capital in Furie in order to obtain mineral rights, drill exploration and production wells, as well as to build the infrastructure necessary to extract, process, and sell natural gas, for the purpose of creating a business selling natural gas to customers.  *Id.* ¶ 2; Dkt. 24-8 ("Kososki Decl.") ¶ 9.

### I.   The Term Loan Credit Agreement and Pledge Agreement

Furie later needed additional financing to supplement the equity funding it received from DOGSA.  Draft Compl. ¶ 27.  On July 15, 2014, ECP, a private equity and credit investment

---

[1] The facts in this section are taken from Plaintiff's Summons with Notice, Dkt. 5-1, and Draft Complaint, Dkt 21-2, and are assumed to be true for purposes of these motions.  *See Weiss v. Hager*, No. 11 Civ. 2740 (VB), 2011 WL 6425542, at *2 (S.D.N.Y. Dec. 19, 2011) (accepting allegations in complaint as true when considering motion to remand); *Tlapanco v. Elges*, 207 F. Supp. 3d 324, 326 n.2 (S.D.N.Y. 2016) (accepting allegations in complaint as true when considering motion to transfer).  They are also drawn from the declarations filed in support of the parties' briefs, which this Court may consider in deciding the motion to remand, *see Marc J. Bern & Partners LLP v. U.S. Legal Support, Inc.*, 17 Civ. 6771 (ER), 2018 WL 2943784, at *1 n.1 (S.D.N.Y. June 11, 2018), and the motion to transfer, *see Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 735 n.1 (S.D.N.Y. 2013).  The Court also takes judicial notice of the record in the Delaware Chapter 11 bankruptcy proceeding, *In re Furie Operating Alaska, LLC, et al.*, Case No. 19-11781 (LSS) (the "Furie Bankruptcy").  *See Argosy Capital Group III, L.P. v. Triangle Capital Corp.*, 17 Civ. 9845 (ER), 2019 WL 140730, at *1 n.1 (S.D.N.Y. Jan. 9, 2019).  The Court hereinafter uses the citation "Bankr. Dkt." to refer to all docket entries in the Furie Bankruptcy.

firm, extended $160 million in credit to Furie and its parent company, Cornucopia Oil and Gas Company ("Cornucopia") pursuant to a Credit Agreement.  Draft Complaint ¶ 28; Kososki Decl. ¶ 8.

That same day, DOGSA entered into a Pledge Agreement with ECP whereby DOGSA agreed to grant certain security interests in favor of ECP as required by the Credit Agreement. Dkt. 18-1 ("Pledge Agreement") § 2.01.  Section 8.12(b) of the Pledge Agreement provided the following with respect to jurisdiction:

> Each of the parties hereto agree that any legal action or proceeding by or against the Grantor, or with respect to or arising out of or relating to this Agreement, may be brought in or removed to the courts of the State of New York, in and for the County of New York, or, to the extent permitted by Applicable Law, of any federal court sitting in the borough of Manhattan.  By execution and delivery of this Agreement, each of the parties hereto accepts, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall affect the right of the Collateral Agent or the Secured Parties to bring legal action or proceedings in any other competent jurisdiction and nothing shall limit the right of the Collateral Agent or the Secured Parties to sue in any other jurisdiction in connection with the exercise of the rights under this Agreement or any other Security Documents or the enforcement of any judgment . . . .

Dkt. 21-1 ("Pledge Agreement") § 8.12(b) (italics in original).[2]

## II.   Subsequent Credit Agreements and ECP's Management of Furie

As Furie continued to face capital shortfalls over the subsequent months and years, DOGSA lent additional equity financing and ECP lent additional debt financing pursuant to amendments and restatements to the original Credit Agreement.  Kososki Decl. ¶¶ 10-20; Draft Compl. ¶¶ 30. 33.  Under the amendments to the Credit Agreement, ECP's role in overseeing Furie's day-to-day operations and strategy grew.  *See* Draft Compl. ¶¶ 34–37.  DOGSA contends

---

[2] The Pledge Agreement defined the "Grantor" as DOGSA, "Collateral Agent" as ECP and its successors and assigns, and the "Secured Parties" as the banks, financial institutions, or entities serving as lenders to the Credit Agreement as well as ECP in its capacity as administrative agent and collateral agent.  *Id*. at Preamble & § 1.01.

that ECP "demanded" that Furie engage Ankura Consulting Group, LLC ("Ankura")—a consulting firm with which ECP allegedly had a preexisting relationship—to serve as interim Chief Operating Officer ("COO") of Furie.  *Id.*  ¶¶ 38-39.  After initially protesting the retention of Ankura as COO, DOGSA eventually consented.  *Id.* ¶¶ 41-42.

After Furie triggered defaults under the First Amended and Restated Credit Agreement, ECP initiated foreclosure proceedings in March 2018.  Kososki Decl. ¶¶ 13-14.  On April 12, 2018, the parties reached an agreement that resulted in the Second Amended and Restated Credit Agreement, which included an indemnification provision and a release of claims.  *Id*. ¶ 20; *see also* Dkt. 24-7 ("Second Amended and Restated Credit Agreement") §§ 5.24.1 & 9.25.  Under the Second Amended and Restated Credit Agreement, ECP provided millions of dollars in additional capital.  *Id*.  ECP estimates that, in total, it provided over $360 million in pre-petition financing to Furie.  Kososki Decl. ¶ 8.

Furie agreed to implement certain organizational changes, including switching from being managed by its members to being managed by a three-person board of managers ("BOM").  Kososki Decl. ¶ 21.  Under this new organizational structure, DOGSA and ECP would each appoint one member, and the third member would be independent.  *Id*.  ECP contends that DOGSA's appointed board member, Kay Rieck, proposed the third independent board member, and that "ECP did not control the BOM" as two of the three members were affiliated with DOGSA.  *Id*. ¶ 22, 24.  DOGSA, on the other hand, alleges that "ECP gained the power to dictate who to hire as operators and COO, over Plaintiff's objections," and "Ankura, which acted, and continues to act, as ECP's proxy, gained virtually total control over Furie's operations."  Draft Compl. ¶ 46.  It asserts that ECP demanded provisions in operating agreements that Scott Pinsonnault would have the "power and authority to take any and all

actions delegated to the Designated Interim Chief Operating Officer." *Id*. ¶ 43.  It further claims

that after ECP and Ankura gained greater operational control over Furie, they mismanaged the

business, including by recklessly increasing its expenses, executing questionable contracts, and

mismanaging the drilling, completing, and operation of wells.  *Id*. ¶¶ 47-64.  ECP, for its part,

maintains that these decisions "were the result of the BOM's decision-making process and

unanimous BOM agreement."  Kososki Decl. ¶ 26.

ECP contends that after a pipeline froze in January 2019, Furie was unable to fulfill its

gas supply contracts and incurred significant losses, leading to a cash interest payment default in

Q1 2019.  Kososki Decl. ¶ 27.  After ECP's representative resigned from the BOM in March

2019, it initiated foreclosure proceedings together with other prepetition term loan lenders.  *Id*.

¶¶ 29-31.  ECP and the other prepetition loan lenders agreed to postpone seeking a public auction

five times to provide Furie with an opportunity to find a buyer or otherwise remedy its liquidity

problems.  *Id*. ¶ 32.  Ultimately, Furie sought Chapter 11 protection.  *Id*.

## III.    The Furie Bankruptcy & DIP Order

On August 9, 2019, Furie filed a voluntary petition for bankruptcy under Chapter 11 of

the Bankruptcy Code in the Delaware Bankruptcy Court.  *In re Furie Operating Alaska, LLC, et

al.*, No. De19-11781 (LSS) (Bankr. D. Del.) (the "Furie Bankruptcy").  As a result of its filing,

Furie became a debtor in possession ("DIP").[3]  In a September 26, 2019 Order (the "DIP

Order"), the Delaware Bankruptcy Court preliminarily approved $15 million in DIP financing by

ECP to Furie during the restructuring, in consideration for a release by Furie of all prepetition

claims and causes of action against ECP (the "DIP Releases").  *See* Dkt. 24-2 (Bankr. Dkt. 186).

---

[3] A "debtor-in-possession" refers to a Chapter 11 debtor that "continues to operate its business as a fiduciary to the bankruptcy estate."  Black's Law Dictionary (10th ed. 2014); *see also In re Bayou Grp., L.L.C.*, 363 B.R. 674, 686 (S.D.N.Y. 2007) ("[An] entity that files in Chapter 11 is automatically authorized to act as the debtor-in-possession.") (citing 11 U.S.C. § 1101(1)), *aff'd sub nom. In re Bayou Grp., LLC*, 564 F.3d 541 (2d Cir. 2009).

The DIP Order gave the other parties to the proceeding until October 28, 2019 to challenge the DIP Releases.  *Id*.  Also on September 26, 2019, the Delaware Bankruptcy Court entered a Bidding Procedures Order approving a sale process for all or substantially all of Furie's assets or equity.  Dkt. 24-5 (Bankr. Dkt. 185).

On September 30, 2019, Kay Rieck, chair of the board of directors at DOGSA and former member of the BOM at Furie, filed a declaration objecting to Furie's application to retain Ankura as Furie's advisor and appoint Scott Pinsonnault to serve as Interim Chief Operating Officer of Furie.  Dkt. 5-5 (Bankr. Dkt. 193).  Rieck alleged that while Pinsonnault served as Furie's Interim Chief Operating Officer, he "made several questionable operational decisions in consultation with ECP, and over my objections, which had catastrophic consequences for [Furie's] business."  *Id*. ¶ 8.  Rieck asserted that "Pinsonnault and Ankura lack the skill, knowledge, and experience to manage" Furie, and that Furie "should be asserting claims against Pinsonnault and Ankura for malfeasance."  *Id*. ¶ 9.  Rieck further maintained that ECP exercised "control" of Furie's operations, including by "requir[ing] that [Furie's] operating agreements be amended to include restrictions on the ability of [Furie's] managers to supervise or terminate Ankura."  *Id*. ¶ 19.  The declaration described many of the same facts regarding ECP and Ankura's alleged mismanagement of Furie that are detailed in the Draft Complaint in this action.

On October 28, 2019, two purported creditors—Bruce Webb and Webb Family Trust, and Certain Royalty Working Interest Owners (collectively the "Furie Creditors")—filed motions challenging the DIP Releases, which they amended by on November 18, 2019 (the ("Standing Motions").  Dkts. 5-2 (Bankr. Dkt. 283) ("Webb Standing Motion") & 5-3 (Bankr. Dkt. 285) ("RWIO Standing Motion").  The Furie Creditors argued that Furie held valuable claims against ECP that should not be released—namely, that ECP, Pinsonnault, and Ankura

"engaged in inequitable conduct . . . . amounting to multiple breaches of the duty of good faith and fear dealing, gross negligence in the management of [Furie,] and intentional fraud." Webb Standing Motion ¶ 14; *see also* RWIO Standing Motion (similar). In their Standing Motions, the Furie Creditors sought derivative standing to assert causes of action on behalf of Furie's estates. *See* Webb Standing Motion; RWIO Standing Motion. DOGSA, by contrast, did not file any objection to the DIP Releases, and advised the Furie Creditors "that it did not intend to seek standing to pursue any derivative claims." Webb Standing Motion ¶ 3 n.3.

ECP, Furie, and the Furie Creditors (but not DOGSA) undertook document discovery regarding the allegations in the Furie Creditors' Standing Motions, encompassing 52,367 total documents produced and four depositions taken. Kososki Decl. ¶ 42. On December 12 and 20, 2019, the Delaware Bankruptcy Court held evidentiary hearings regarding the Standing Motions, at which eight witnesses testified. Kososki Decl. ¶ 43. The Delaware Bankruptcy Court ordered additional briefing and scheduled oral argument on the Standing Motions. *Id.* ¶ 28. On February 18, 2020, Furie filed a motion with the Delaware Bankruptcy Court seeking approval of settlement agreements that would resolve the Standing Motions, Bankr. Dkt. 532, which the Delaware Bankruptcy Court approved on March 4, 2020, Bankr. Dkt. 617.

After filing three earlier versions of a proposed plan of reorganization, Furie filed a Third Amended Joint Plan of Reorganization (the "Plan") on June 7, 2020. Bankr. Dkt. 806. On June 12, 2020, the Delaware Bankruptcy Court entered an order confirming the Plan. Bankr. Dkt. 835. Article VIII of the Plan expressly releases ECP from "any Claim or Cause of Action, derivatively, by through, or on behalf of" Furie. *Id*. at Art. VIII(C). In addition, Article XI of the Plan, entitled "Retention of Jurisdiction," provides that "[n]otwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the

Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan." *Id*. at Art. XI.  The Plan goes on to provide a broad, non-exhaustive list of matters over which the Bankruptcy Court retains jurisdiction. *Id*.

## PROCEDURAL HISTORY

On November 12, 2019—after Furie had filed for Chapter 11 bankruptcy, the DIP Order had been entered, and the deadline to object to the DIP Order had passed, but before the Plan was confirmed—Plaintiff commenced this action by filing a Summons with Notice in the Supreme Court for the State of New York, County of New York under the case caption *Deutsche Oel & Gas S.A. v. Energy Capital Partners Mezzanine Opportunities Fund A, LP, et al.*, Index No. 656717/2019.  Dkt. 1-1 ("Summons with Notice").  The Notice provided:

> Over the course of the parties' relationship, ECP made material misstatements, and failed to disclose material information, to Plaintiff, and in so doing coerced Plaintiff into agreeing to various concessions that increased Furie's indebtedness to ECP while giving ECP greater—and eventually total—decision-making authority over Furie's business. Over the next several years, Furie was destroyed by the combination of the additional debt imposed by ECP and the incompetence of ECP's chosen manager, Ankura Consulting Group.

> ECP has maneuvered Furie into filing petitions under chapter 11 of the Bankruptcy Code so that ECP could orchestrate a sale of Furie without input from Plaintiff. Under ECP's control, the bankruptcy cases will result in the complete loss of the monies provided to Furie by Plaintiff through the confirmation of a plan of reorganization that will extinguish Plaintiff's interest in Furie. Had Plaintiff known ECP's intention to wrest control of and destroy Furie, Plaintiff would not have entered into or consented to any contractual relationship or agreement with ECP.

*Id*.

In DOGSA's Draft Complaint, it asserts four state law causes of action: (i) gross negligence, (ii) fraudulent inducement, (iii) civil conspiracy to commit fraud, and (iv) breach of the implied covenant of good faith and fair dealing.  Draft Compl. ¶¶ 67-88.  DOGSA alleges that ECP is liable for gross negligence because it failed to exercise a "reasonable level of care when making decisions," including by "insist[ing] on maintaining Ankura and Pinsonnault's

retention to oversee Furie's operations even after they displayed a shocking degree of incompetence and mismanagement," which purportedly "led to Furie's bankruptcy."  Draft Compl. ¶¶ 67–71.  DOGSA further claims that it was subject to fraudulent inducement when it reasonably relied on ECP's fraudulent misrepresentations and omissions of material information with respect to retaining Ankura, which it again alleges "drove Furie into bankruptcy."  *Id.*  ¶¶ 72–78.  DOGSA next contends that ECP engaged in civil conspiracy to commit fraud by making false statements of material fact and failing to disclose material facts with respect to retaining Ankura, which "enable[d] ECP to exercise total control over Furie" and "driv[e] Furie to insolvency and bankruptcy."  *Id.* ¶¶ 79–83.  Finally, DOGSA maintains that ECP breached the implied covenant of good faith and fair dealing by "enter[ing] into the [Pledge Agreement] knowing they were going to destroy the value of [DOGSA's] pledge and equity in Furie."  *Id.* at ¶¶ 84–88.

On December 2, 2019, ECP filed a timely Notice of Removal, asserting federal bankruptcy jurisdiction under 28 U.S.C. §§ 1334, 1446, 1452 and Fed. R. Bankr. P. 9027.  Dkt. 1.  On the same day, ECP filed a motion to transfer this action to the United States District Court for the District of Delaware, pursuant to 28 U.S.C. §§ 1404(a) and 1412, for referral to the Delaware Bankruptcy Court.  Dkts. 4 & 5 ("ECP Transfer Memo").

On January 2, 2020, in addition to filing an opposition to the motion to transfer, Dkt. 17 ("DOGSA Transfer Opp'n"), DOGSA filed a motion to remand the case back to the New York Supreme Court, Dkts. 19 & 20 ("DOGSA Remand Memo").  On January 9, 2020, ECP filed its reply in support of the motion to transfer, Dkt. 22 ("ECP Transfer Reply"), and opposition to the motion to remand, Dkt. 23 ("ECP Remand Opp'n").  On January 16, 2020, DOGSA filed its reply in support of the motion to remand, Dkt. 25 ("DOGSA Remand Reply"), and a sur-reply on

the motion to transfer, Dkt. 26 ("DOGSA Transfer Sur-Reply").  The parties periodically filed
letters regarding developments in the Furie Bankruptcy.  Dkts. 27, 29, 30, 32, 33.

## DISCUSSION

"When presented with competing motions to remand a case and to transfer venue, a court
is to consider the remand motion first, and then address the motion to transfer venue only if it
first denies the motion to remand."  *Stahl v. Stahl*, No. 03 CV 0405, 2003 WL 22595288, at *2
(S.D.N.Y. Nov. 7, 2003).  The Court thus considers DOGSA's motion to remand before reaching
ECP's motion to transfer.  For the reasons that follow, the Court denies DOGSA's motion to
remand and grants ECP's motion to transfer.

## I.    DOGSA's Motion to Remand

### A.  Legal Standards

Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil
action . . . to the district court for the district where such civil action is pending, if such district
court has jurisdiction of such claim or cause of action under section 1334 of this title."  28 U.S.C.
1334(b), in turn, vests district courts with jurisdiction over "all proceedings *arising under* title
11, or *arising in* or *related to* cases under title 11."  28 U.S.C. 1334(b) (emphasis added).  These
"three types of jurisdiction that district (and hence bankruptcy) courts may exercise under § 1334
are colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction."  *Lothian
Cassidy, LLC v. Lothian Exploration & Development II, L.P.*, 487 B.R. 158, 161 (S.D.N.Y.
2013) (internal quotation marks and citation omitted).  "Arising under" proceedings consist of
causes of action created by Title 11 of the Bankruptcy Code, meaning any matter under which a
claim is made under a provision of [T]itle 11."  *Id.* at 161-62 (internal quotation marks and
citation omitted).  "Arising in" jurisdiction exists in a matter where the claims "are not based on

any right expressly created by title 11, but nevertheless, would have no existence outside the bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 350–51 (2d Cir. 2010) (internal quotation marks and citation omitted). Lastly, "related to" jurisdiction exists if the action's "outcome might have any conceivable effect on the bankrupt estate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal quotation marks and citation omitted). "Where, as here, the bankruptcy plan in question has already been confirmed, the Bankruptcy Court's jurisdiction shrinks to cover only matters that have a 'close nexus' to the bankruptcy plan and the plan provides for jurisdiction over the dispute." *Lothian Cassidy, LLC*, 487 B.R. 158, 162 (S.D.N.Y. 2013) (citing *In re DPH Holdings Corp.*, 437 B.R. 88, 97 (S.D.N.Y.2010)).

The specific basis for jurisdiction dictates whether a case is deemed a "core" or "non-core" bankruptcy proceeding. The Second Circuit has held that "core proceedings should be given a broad interpretation that is close to or congruent with constitutional limits." *In re U.S. Lines, Inc.*, 197 F.3d 631, 636–37 (2d Cir. 1999) (internal quotation marks omitted). If a district court has only "related to" jurisdiction, then the case is a "non-core" proceeding, and the doctrine of mandatory abstention applies. *Baker*, 613 F.3d at 350. Pursuant to that doctrine:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11 . . . the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2). Where a case has been removed from state court and a party, such as DOGSA here, has argued that mandatory abstention under 28 U.S.C. § 1334(c)(2) applies, the Court must abstain if the following six criteria are met:

> (1) the motion to abstain was timely; (2) the action is based on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section 1334 provides the sole basis for federal jurisdiction; (5) an action is commenced in state court; [and] (6) that action can be "timely adjudicated" in state court.

11

*Trs. of Masonic Hall & Asylum Fund v. Pricewaterhousecoopers LLP*, No. 08 Civ. 10494

(GEL), 2009 WL 290543, at *4 (S.D.N.Y. Feb. 6, 2009) (quoting *In re WorldCom, Inc. Secs.*

*Litig.*, 293 B.R. 308, 331 (S.D.N.Y.2003)).

If a district court has either "arising under" or "arising in" jurisdiction, however, then the

action is deemed a "core proceeding," *Baker*, 613 F.3d at 350, and the doctrine of permissive—

not mandatory—abstention applies, *see* 28 U.S.C. § 1334(c)(1) ("[N]othing in this section

prevents a district court in the interest of justice, or in the interest of comity with State courts or

respect for State law, from abstaining from hearing a particular proceeding arising under title 11

or arising in or related to a case under title 11.").  Against the bedrock principle that federal

courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colo.*

*River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976), courts balance the

following factors in deciding whether permissive abstention is warranted:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court
> recommends abstention, (2) the extent to which state law issues predominate over
> bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> (4) the presence of a related proceeding commenced in state court or other
> nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §
> 1334, (6) the degree of relatedness or remoteness of the proceeding to the main
> bankruptcy case, (7) the substance rather than form of an asserted 'core'
> proceeding, (8) the feasibility of severing state law claims from core bankruptcy
> matters to allow judgments to be entered in state court with enforcement left to
> the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that
> the commencement of the proceeding in a bankruptcy court involves forum
> shopping by one of the parties, (11) the existence of a right to a jury trial, and (12)
> the presence in the proceeding of nondebtor parties.

*Lothian Cassidy*, 487 B.R. at 165 (citations omitted).

"The fact that the origin of . . . claims [is] found in state law [is] not dispositive" with

respect to whether a case is core or non-core.  *Baker*, 613 F.3d at 350; *see also* 28 U.S.C. §

157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely

on the basis that its resolution may be affected by [s]tate law.").  "Rather, the determinative issue

is whether claims that appear to be based in state law are really an extension of the proceedings already before the bankruptcy court." *Baker*, 613 F.3d at 350. "Common-law claims closely connected with the administration of the bankruptcy can qualify as 'arising in' a bankruptcy even though they may, in a literal sense, be brought outside a bankruptcy action." *Lothian Cassidy, LLC*, 487 B.R. at 162 (S.D.N.Y. 2013).

Even if the Court finds federal bankruptcy jurisdiction under 28 U.S.C. § 1334(b), it may remand the case for equitable reasons pursuant to 28 U.S.C. § 1452(b), which provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." In assessing whether to remand a case under 28 U.S.C. § 1452(b), courts consider a similar set of factors as when deciding whether to permissively abstain pursuant to 28 U.S.C. § 1334(c)(1), including:

> (1) whether issues of state law predominate; (2) whether judicial economy would be served by . . . equitable remand; (3) whether § 1334(b) is the sole basis for exercising federal jurisdiction; (4) whether the proceeding involves non-debtors; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and (6) the likelihood that the proceeding was commenced in a particular forum because of forum shopping on the part of one of the parties.

*Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

ECP, as the party seeking removal, bears the burden of establishing that this Court has subject matter jurisdiction over DOGSA's claims. *Montefiore Medical Center v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011). "Out of respect for the limited jurisdiction of the federal courts and the rights of states, [courts] must resolv[e] any doubts against removability." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007).

In its motion to remand, DOGSA argues that the Court lacks "arising under," "arising in," or "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b).  *See* DOGSA Remand Memo at 6-12.  DOGSA then makes three arguments in the alternative in the event that the Court finds that it has federal bankruptcy jurisdiction over the action.  First, DOGSA asserts that if the Court determines it has "related to" jurisdiction, it must abstain from adjudicating the action under 28 U.S.C. § 1334(c)(2).  *Id*. at 13-14.  DOGSA next contends that the Court should exercise permissive abstention under 28 U.S.C. § 1334(c)(1).  *Id*. at 14–15.  Finally, DOGSA maintains that the Court should remand this case on equitable grounds under 28 U.S.C. § 1452(b).  *Id*. at 15–16.

ECP, by contrast, argues that the Court has both "arising in" and "related to" jurisdiction under 28 U.S.C. § 1334(b).[4]  *See* ECP Remand Opp'n ¶¶ 41-56.  It also contends that mandatory abstention does not apply, and that permissive abstention and equitable remand are not appropriate under the present circumstances.  *Id*. at 22-24.

For the reasons that follow, the Court holds that it has "arising in," "related to," and post-confirmation jurisdiction over this action.

### B.   "Arising in" Jurisdiction

ECP argues that the Court has "arising in" jurisdiction over this case.  While the meaning of "arising in" jurisdiction "is not entirely clear" from the statutory language, courts in this Circuit have found that "arising in" jurisdiction exists in a matter where the claims "are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside the bankruptcy."  *Baker*, 613 F.3d at 350–51 (internal quotation marks and citations omitted).  "A bankruptcy court's decision to interpret and enforce a prior sale order falls under this

---

[4] ECP does not contend that this Court has "arising under" jurisdiction—which it plainly does not, as DOGSA asserts four state law claims and does not assert any claims that arise under Title 11.

formulation of 'arising in' jurisdiction," as "[a] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016) (internal quotation marks and citation omitted). As described above, "arising in" proceedings are deemed "core" bankruptcy proceedings. *Id.* "In those proceedings, bankruptcy courts retain comprehensive power to resolve claims and enter orders or judgments." *Id.* (citation omitted).

In assessing whether a contract dispute "arises in" Title 11, courts often apply the following two factors set forth by the Second Circuit: "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *In re U.S. Lines, Inc.*, 197 F.3d at 637. Determining whether a proceeding is independent of the reorganization "hinges on the nature of the proceeding." *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002) (internal quotation marks and citation omitted). A proceeding may be deemed core, by its nature, "if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings . . . or (2) the proceedings directly affect a core bankruptcy function." *Id.* As stated above, the Second Circuit has held that "core proceedings should be given a broad interpretation that is close to or congruent with constitutional limits." *In re U.S. Lines, Inc.*, 197 F.3d at 637 (internal quotation marks and citations omitted).

This action involves four state law claims against ECP. *See* Draft Compl. One of those claims—breach of the implied covenant of good faith and fair dealing—involves the July 15, 2014 Pledge Agreement, which is antecedent to the reorganization and thus weighs against the core status of the proceedings. *See In re Petrie Retail, Inc.*, 304 F.3d at 229 (2d Cir. 2002).

DOGSA's claims are not, however, "independent of the reorganization," and the impact of the claims "on other core bankruptcy functions renders [this proceeding] core." *Id.* While the fact that ECP's claims are based in state law is not dispositive, such claims will typically be considered "unique to or uniquely affected by" bankruptcy proceedings only if they are "really an extension of the proceedings already before the bankruptcy court." *Baker*, 613 F.3d at 350. Here, although ECP's claims are grounded in state law, the Court finds that they are nonetheless "inseparable from the bankruptcy context" for a number of reasons. *Id.*

First, claims may be "core" to a bankruptcy proceeding and may "arise in" that proceeding if they require a court to interpret a bankruptcy court order. *See, e.g.*, *Argosy Capital Group III, L.P. v. Triangle Capital Corp.*, 17 CIV 9845 (ER), 2019 WL 140730, at *6 (S.D.N.Y. Jan. 9, 2019) (finding that state law claims including conversion and breach of the implied duty of good faith and fair dealing constituted a core proceeding because claims were based on bankruptcy court's orders); *KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 227 (S.D.N.Y. 2019) (finding "arising in" jurisdiction where "the dispute concerns a post-petition contract the resolution of which depends upon the interpretation of bankruptcy court orders"); *Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 162 (S.D.N.Y. 2013) ("'Arising in' claims may include matters involving the enforcement or construction of a bankruptcy court order.").

Here, ECP contends that this action involves enforcement and interpretation of the DIP Order. ECP Remand Opp'n ¶ 45. The Court agrees. DOGSA repeatedly asserts that ECP's mismanagement drove Furie to bankruptcy, and that ECP continued to exercise improper control over Furie in the course of the bankruptcy proceedings. The Draft Complaint alleges, for example:

> ECP maneuvered Furie into filing petitions under chapter 11 of the Bankruptcy Code so that ECP could orchestrate a sale of Furie without input from [DOGSA]. After the bankruptcy petitions were filed, ECP solidified its control over the bankruptcy process by further encumbering Furie with debtor-in-possession financing that imposed milestones to give ECP control over the sale process and attempted to grant ECP the releases that plaintiff refused to grant.

Draft Compl. ¶ 7.  In other words, the Draft Complaint focuses not merely on ECP's pre-petition conduct, but also on its actions during the bankruptcy proceeding—specifically, its act of "encumbering Furie with debtor-in-possession financing" through the DIP Order.  *Id*.  DOGSA's Summons and Notice likewise describes the Furie Bankruptcy as the very injury for which it seeks relief.  *See* Summons and Notice ("ECP has maneuvered Furie into filing petitions under chapter 11 of the Bankruptcy Code so that ECP could orchestrate a sale of Furie without input from Plaintiff. Under ECP's control, the bankruptcy cases will result in the complete loss of the monies provided to Furie by Plaintiff through the confirmation of a plan of reorganization that will extinguish Plaintiff's interest in Furie.").  DOGSA's claims are thus not independent of the reorganization, as they focus on ECP's alleged wrongdoing leading up to and in the course of the Furie Bankruptcy.  *See Argosy Capital Group III, L.P.*, 2019 WL 140730, at *6 (holding proceeding was core where plaintiff challenged defendant's "conduct in becoming DIP lender notwithstanding the Bankruptcy Court's repeated approval of [defendant] as a good-faith DIP lender.").

ECP next argues that this action affects the administration of the Furie Bankruptcy estates as it requires interpretation of the releases and indemnification provisions in the Second Amended and Restated Credit Agreement, which in turn were interpreted in the course of the Furie Bankruptcy.  *See* ECP Remand Opp'n ¶ 46; Second Amended and Restated Credit Agreement § 5.24.1 (providing that Furie will indemnify ECP for "any and all claims . . . in any way relating to, or arising out of or in connection with," the agreement or "the transactions

contemplated thereunder"); *id.* § 9.25 (releasing "ANY AND ALL CLAIMS . . . WHICH ANY

OF THE RELEASING PARTIES HAS OR MAY ACQUIRE IN THE FUTURE RELATING IN

ANY WAY TO ANY EVENT, CIRCUMSTANCE, ACTION OR FAILURE TO ACT AT ANY

TIME ON OR PRIOR TO THE EFFECTIVE DATE HEREOF").  The DIP Order itself also

includes a release of Furie's pre-petition claims and causes of action against ECP, *see* Bankr.

Dkt. 186, and the Plan likewise releases ECP from "any Claim or Cause of Action, derivatively,

by through, or on behalf of" Furie, Bankr. Dkt. 835 at Art. VIII(C).  In short, ECP contends that

if DOGSA prevails in this action and receives damages from ECP, then ECP may bring an

indemnification claim against Furie.  It also argues that some of the claims in this action are

subject to the aforementioned releases.  Both of these issues, ECP claims, affect the

administration of the bankruptcy estates.

  DOGSA contends that ECP's argument with respect to the releases is "nonsense" because

the releases relate to claims held by Furie against ECP, whereas the claims in this action are

direct claims that DOGSA asserts on its own behalf, not derivative claims brought on behalf of

Furie.  DOGSA Remand Reply at 6.  ECP responds that while DOGSA "frames its claims as

direct claims, crafty pleading cannot avoid the fact that its claims are derivative causes of action

owned by the Furie Debtors and released in the DIP Order."  ECP Transfer Reply ¶ 19.  As ECP

points out in a letter to the Court, Dkt. 34, the Third Circuit, which encompasses the Delaware

Bankruptcy Court, recently stated that "[c]laims alleging that third parties wrongfully depleted

the debtor's assets are general or derivative because every creditor has a similar claim for the

diversion of assets of the debtor's estate."  *In re Wilton Armetale, Inc.*, 968 F.3d 273, 282 (3d

Cir. 2020) (internal quotation marks, brackets, and citations omitted).  "The theory of recovery

for those claims is not tied to the harm done to the creditor by the debtor," but rather is "based on

an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claims against the debtor." *Id*. (internal quotation marks, brackets, and citations omitted).  Similarly, in the Second Circuit:

> Derivative claims in the bankruptcy context are those that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy.  In distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy . . . . If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.  Whereas a derivative injury is based upon a secondary effect from harm done to the debtor, an injury is said to be particularized when it can be directly traced to the third party's conduct.  Non-derivative claims are personal to the individual creditor and of no interest to the others.

*In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017) (internal quotation marks, brackets, and citations omitted).

At minimum, the Court agrees with ECP that DOGSA's gross negligence claim is derivative because it is not based on circumstances unique to DOGSA, but rather is "based on an injury to the debtor's estate that creates a secondary harm to all creditors."  *In re Wilton Armetale, Inc.*, 968 F.3d at 282.  Indeed, the allegations and claims in DOGSA's Draft Complaint are remarkably similar to those in the Standing Motions filed by the Furie Creditors, which also alleged that ECP engaged in gross negligence.[5]  Accordingly, at least DOGSA's gross negligence claim—and potentially one or more of its other claims—implicates the releases at issue in the Furie Bankruptcy and the administration of the bankruptcy estate.

---

[5] *Compare* Draft Compl. ¶¶ 5, 7 ("ECP has maneuvered Furie into filing petitions under chapter 11 of the Bankruptcy Code" after "increas[ing] Furie's indebtedness to ECP while concurrently giving ECP greater— eventually total— decision-making authority over Furie's business.") *with* Webb Standing Motion ¶ 19 ("[T]he ECP the ECP Defendants . . . effect[ed] a hostile take-over of the Debtors' management, to the extreme detriment of [DOGSA], . . . [and] the Debtors' bankruptcy estates and their creditors . . . including Webb."), *and* RWIO Standing Motion ¶ 25 ("The Debtors, through the . . . ECP Defendants' control have engaged in actions that constitute gross negligence and willful misconduct all of which has resulted in substantial damage to the Debtors' estates.").

DOGSA also contends that any "purported indemnification claim would be extinguished" under the Plan as a "General Unsecured Claim."  DOGSA Remand Reply at 2.  This very argument, however, depends on a construction of the Plan and involves the administration of the bankruptcy estate, which in turn renders this action a core proceeding.  *See Argosy Capital Group III, L.P.*, 2019 WL 140730, at *6 (holding claims "directly affect core proceedings because they implicate the indemnity provision" which, "if triggered, directly affects the administration of [the] estate.").

In sum, the Court holds that it has "arising in" jurisdiction over this action because (1) DOGSA challenges ECP's actions during the bankruptcy proceeding—specifically, its act of "encumbering Furie with debtor-in-possession financing" through the DIP Order, (2) at least one of DOGSA's claims is in fact a derivative claim that implicates the releases in the DIP Order and Plan, and (3) DOGSA's claims implicate an indemnity provision and thus the administration of the bankruptcy estate.

### C.  "Related to" and Post-Confirmation Jurisdiction

ECP argues that regardless of whether the Court has "arising in" jurisdiction over DOGSA's claims, it plainly has "related to" jurisdiction.  *See* ECP Remand Opp'n ¶¶ 50-56. The Court agrees.  "Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339 (2d Cir. 2018) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307–08 (1995)).  As previously noted, "related to" jurisdiction exists if the action's "outcome might have any conceivable effect on the bankruptcy estate."  *Parmalat Capital Fin. Ltd.*, 639 F.3d at 579.  Here, the action has a "conceivable effect" on the bankruptcy estate because of the releases and indemnification provisions discussed above.

The standard for exercising bankruptcy jurisdiction, however, differs after confirmation

of a bankruptcy plan.  "Section 1334 does not expressly limit the bankruptcy court's jurisdiction

following plan confirmation.  Nevertheless, all courts that have addressed the question have

ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks."  *In re DPH*

*Holdings Corp.*, 437 B.R. at 97 (internal quotation marks and citations omitted), *aff'd*, 448 F.

App'x 134 (2d Cir. 2011).  "A party asking a bankruptcy court to exercise post-confirmation

jurisdiction must establish that (1) the matter has a close nexus to the bankruptcy plan or

proceeding, as when a matter affects the interpretation, implementation, consummation,

execution, or administration of the confirmed plan" and (2) that the plan provides for the

retention of jurisdiction over the dispute."  *Id.* (internal quotation marks, citations, and brackets

omitted).

As to the first factor, there is a close nexus between this action and the Furie Bankruptcy

for the very reasons identified in the Court's analysis of "arising in" jurisdiction.  This close

nexus is reinforced by the fact that the Delaware Bankruptcy Court is already familiar with the

factual allegations and claims at the heart of DOGSA's Draft Complaint.  As described above,

the Delaware Bankruptcy Court held evidentiary hearings and heard from eight witnesses

regarding the Furie Creditors' Standing Motions, which overlap substantially with the Draft

Complaint, including by alleging that ECP engaged in gross negligence.  *See supra* note 5.  The

Delaware Bankruptcy Court also gained familiarity with Plaintiff's allegations when Kay Rieck,

chair of the board of directors at DOGSA and former member of the BOM at Furie, filed a

declaration objecting to Furie's application to retain Ankura as Furie's advisor and appoint Scott

Pinsonnault to serve as Interim Chief Operating Officer of Furie.  The declaration described

many of the same facts regarding ECP and Ankura's alleged mismanagement of Furie that are

detailed in the Draft Complaint in this action.  The Court thus finds a close nexus between the two actions.

As to the second factor, the Plan explicitly provides for the retention of jurisdiction.  As described above, Article XI of the Plan, entitled "Retention of Jurisdiction," provides that "[n]otwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan."  *Id*. at Art. XI.  The Plan provides a broad, non-exhaustive list of matters over which the Bankruptcy Court would retain jurisdiction, including jurisdiction to:

> 1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest . . .
>
> 4. determine any other matters that may arise in connection with or relate to the Plan . . .
>
> 13.  resolve any cases, controversies, suits, disputes, or causes of action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such Orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions . . .
>
> 17. hear and determine disputes arising in connection with the interpretation, implementation, modification, or enforcement of the Plan . . . [and]
>
> 22. enforce the discharge, injunction, release, and exculpation provisions set for in Article VIII hereof.

*Id*. at Art. XI.  Such a broad retention of jurisdiction plainly encompasses the claims in this action.

In sum, the Court finds "arising in," "related to," and post-confirmation jurisdiction over this action.

### D.  Permissive Abstention and Equitable Remand

In light of the fact that the Court's exercise of jurisdiction is not limited to "related to"

jurisdiction, mandatory abstention does not apply.  *See* 28 U.S.C. § 1334(c)(2) (providing

mandatory abstention applies in a proceeding "related to a case under title 11 *but not* arising

under title 11 or arising in a case under title 11") (emphasis added).  The Court thus turns to

DOGSA's requests for permissive abstention under 28 U.S.C. § 1334(c)(1) and for equitable

remand under 28 U.S.C. § 1452(b).  As the permissive abstention and equitable remand factors

overlap significantly, the Court analyzes them together.  *See In re WorldCom*, 293 B.R. at 334

("The equitable remand analysis…is essentially the same as the Section 1334(c)(1) abstention

analysis.").  This analysis involves consideration of the following factors:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court
> recommends abstention, (2) the extent to which state law issues predominate over
> bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> (4) the presence of a related proceeding commenced in state court or other
> nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §
> 1334, (6) the degree of relatedness or remoteness of the proceeding to the main
> bankruptcy case, (7) the substance rather than form of an asserted 'core'
> proceeding, (8) the feasibility of severing state law claims from core bankruptcy
> matters to allow judgments to be entered in state court with enforcement left to
> the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that
> the commencement of the proceeding in a bankruptcy court involves forum
> shopping by one of the parties, (11) the existence of a right to a jury trial, and (12)
> the presence in the proceeding of nondebtor parties.

*Lothian Cassidy*, 487 B.R. at 165 (citations omitted).

DOGSA has failed to satisfy its burden to establish that either permissive abstention or an

equitable remand is appropriate here.  *See CAMOFI Master LDC v. U.S. Coal Corp.*, 527 B.R.

138, 143 (Bankr. S.D.N.Y. 2015) (noting that party seeking remand bears the burden to establish

that equitable remand is warranted); *In re Residential Capital, LLC*, 515 B.R. 52, 67 (Bankr.

S.D.N.Y. 2014 (same as to permissive abstention).  Principles of comity are not offended by

declining to remand or abstain from this action.  Indeed, the state law claims are not novel or

complex, which "significantly undercuts the degree to which the state law factor weighs in favor of remand to [the] New York courts." *Renaissance Cosmetics, Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 17 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).  The state court has also "invested little or no time" in this case as ECP removed the action shortly after it was filed. *Krys v. Sugrue*, No. 08 Civ. 3065 (GEL), 2008 WL 4700920, at *10 (S.D.N.Y. Oct. 23, 2008); *Winstar Holdings, LLC*, 2007 WL 4323003, at *5.  Moreover, for the reasons discussed above, this action is closely related to the Furie Bankruptcy, and abstention may negatively impact the efficient administration of the estate.  Remand would create judicial inefficiencies in light of the Delaware Bankruptcy Court's deep familiarity with the factual allegations and claims at the heart of this action.  Given that federal courts have a "virtually unflagging obligation…to exercise the jurisdiction given them," *Colo. River Water Conservation Dist.*, 424 U.S. 800, 817 (1976), the Court finds, on balance, that abstention and remand are not appropriate here.

## II.  ECP's Motion to Transfer

The Court next turns to ECP's motion to transfer this action to the United States District Court for the District of Delaware for automatic referral to the Delaware Bankruptcy Court under 28 U.S.C. §§ 1404(a) and 1412.  Because this case constitutes a "core" bankruptcy proceeding, 28 U.S.C. § 1412 governs whether a transfer of venue is warranted.  *See* 28 U.S.C. § 1412 ("A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.").  ECP bears the burden of establishing that transfer is warranted by a preponderance of the evidence.  *See In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390-91 (2d Cir. 1990).

To determine whether a case should be transferred under 28 U.S.C. § 1412, courts first consider "whether the action could have been brought in the transferee district," and if so,

"whether transfer would be an appropriate exercise of the Court's discretion."  *Capital Mgmt.,*
*L.L.C. v. U.S. Bank Nat'l Ass'n,* No. 14 Civ. 8513(PAE), 2015 WL 1611391, at *3 (S.D.N.Y.
Apr. 10, 2015).  This action could have been brought in the United States District Court for the
District of Delaware as that court has federal subject matter jurisdiction to hear this case for the
same reasons that this Court does.  Likewise, the Delaware Bankruptcy Court—where this case
would be referred to if transferred to the Delaware District Court pursuant to that court's
Standing Order—also has jurisdiction because that is where the Furie Bankruptcy is pending
pursuant to the Delaware Bankruptcy Court's retention of jurisdiction in the Plan.  *See* 28 U.S.C.
§ 1409(a) ("[A] proceeding arising under title 11 or arising in or related to a case under title 11
may be commenced in the district court in which such case is pending.").

In assessing whether transfer would be an appropriate exercise of the Court's discretion,
courts in this Circuit consider the following factors:  "(1) the plaintiff's choice of forum; (2) the
locus of operative facts; (3) convenience factors, such as the location of parties, witnesses, and
evidence; (4) familiarity of the court with the applicable law; and (5) interests of justice,
including trial efficiency."  *Credit Suisse AG v. Appaloosa Inv. Ltd. P'ship I*, No. 15-CV-3474
SAS, 2015 WL 5257003, at *7 (S.D.N.Y. Sept. 9, 2015).  "Although a plaintiff's choice of
forum is normally given substantial weight, it is well-established that the existence of a related
action pending in the transferee court weighs heavily towards transfer."  *Id*. (internal quotation
marks and citations omitted).  "In applying the 'interest of justice' standard, the Second Circuit
has recognized that 'the district in which the underlying bankruptcy case is pending is presumed
to be the appropriate district for hearing and determination of a proceeding in bankruptcy.'"  *Id*.
(quoting *In re Manville Forest Prods. Corp.*, 896 F.2d at 1391).  "The Second Circuit also stated
that the standard is 'broad and flexible . . . [and] must be applied on a case-by-case basis

[because i]t contemplates [ ] consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness-factors.'" *Id.* (quoting *In re Manville Forest Prods. Corp.*, 896 F.2d at 1391).

Here, the first factor—DOGSA's choice of forum—weighs against transfer. DOGSA contends that it filed the action in the New York Supreme Court pursuant to the forum selection clause in the Pledge Agreement. *See* DOGSA Remand Opp'n at 6-7. As described above, that clause provides:

> Each of the parties hereto agree that any legal action or proceeding by or against the Grantor, or with respect to or arising out of or relating to this Agreement, may be brought in or removed to the courts of the State of New York, in and for the County of New York, or, to the extent permitted by Applicable Law, of any federal court sitting in the borough of Manhattan. By execution and delivery of this Agreement, each of the parties hereto accepts, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall affect the right of the Collateral Agent or the Secured Parties to bring legal action or proceedings in any other competent jurisdiction and nothing shall limit the right of the Collateral Agent or the Secured Parties to sue in any other jurisdiction in connection with the exercise of the rights under this Agreement or any other Security Documents or the enforcement of any judgment . . . .

Pledge Agreement § 8.12(b) (italics in original). DOGSA contends that transfer to the Delaware Bankruptcy Court is expressly prohibited in light of ECP's "irrevocabl[e] and unconditional[]" agreement that all disputes arising out of or related to the Pledge Agreement are subject to the "exclusive jurisdiction" of New York courts. *See* DOGSA Remand Opp'n at 6-7.

ECP, by contrast, contends that the forum selection clause should not dictate venue under these circumstances, as courts in this district have held that "when a proceeding is core, the public interest in centralizing bankruptcy proceedings always outweighs the public and private interests in enforcing a forum-selection clause." *Rescap*

*Liquidating Trust v. PHH Mortg. Corp.*, 518 B.R. 259, 268 (S.D.N.Y. 2014); *see also Argosy*, 2019 WL 140730, at *7 (holding the "policy toward enforcement of forum-selection clauses is 'not so strong' as to mandate enforcement in the face of . . . countervailing public interests in centralizing bankruptcy proceedings, judicial economy, and overall justice"); *Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 521 (S.D.N.Y 2015) (holding that, while forum selection clause under which parties consented to jurisdiction in the New York courts weighed against transfer to Delaware bankruptcy court, it did not "carry the day, as actions have frequently been transferred to jurisdictions where bankruptcy proceedings have been pending notwithstanding permissive forum clauses").  Accordingly, while the Court finds that DOGSA's selection of the New York forum pursuant to the Pledge Agreement's forum selection clause weighs against transfer, it is not dispositive.[6]

The second and third factors—the locus of operative facts and convenience factors, such as the location of parties, witnesses, and evidence—neither favors nor disfavors transfer, as the operative facts are geographically dispersed and neither DOGSA nor ECP are located in New York or Delaware.  *See* ECP Transfer Memo ¶ 27; DOGSA Transfer Opp'n at 13.  The fourth factor—the familiarity of the court with the applicable law—does not weigh heavily on the Court's analysis.  "[B]ecause the relevant law is not particularly complex, there is no reason to think that the Delaware court will be less

---

[6] In addition, the Court finds the connection between the Pledge Agreement and three out of four of DOGSA's causes of action tenuous at best.  Although DOGSA mentions the Pledge Agreement in the context of alleging jurisdiction and venue in New York, it never refers to the Pledge Agreement in the factual allegations section of the Draft Complaint.  While DOGSA's breach of the implied covenant of good faith and fair dealing claim relies on the existence of the Pledge Agreement, the other three causes of action appear to bear little, if any, relation to the Pledge Agreement.

capable of applying that law than the New York court." *Renaissance Cosmetics, Inc.*, 277 B.R. at 19.

The fifth factor—the interests of justice, including trial efficiency—weighs heavily in favor of transfer, and is ultimately dispositive. As described above, the allegations and claims in DOGSA's Draft Complaint are remarkably similar to those in the Standing Motions filed by the Furie Creditors, which also alleged that ECP engaged in gross negligence. *See supra* note 5. The Delaware Bankruptcy Court held evidentiary hearings and heard from eight witnesses regarding the Standing Motions, and also approved the settlement of those Motions. *See* Bankr. Dkt. 617. The Delaware Bankruptcy Court also gained familiarity with DOGSA's claims when Kay Rieck filed a declaration that described many of the same facts regarding ECP and Ankura's alleged mismanagement of Furie that are detailed in the Draft Complaint in this action. Moreover, the Delaware Bankruptcy Court is best positioned to analyze its own DIP Order and the Plan it has approved, which, for the reasons described above, are implicated in both the substance of DOGSA's claims and ECP's potential defenses regarding the releases. Finally, transfer to the Delaware Bankruptcy Court will enable it to promptly resolve any of ECP's potential claims for indemnification that could impact the administration of the estate.

On balance, the fifth factor weigh heavily in favor of transfer and predominates over the first. In sum, the Court finds that judicial economy and the interest of justice are best served by transferring this action.

## CONCLUSION

For the foregoing reasons, DOGSA's motion to remand this case is denied, and ECP's motion to transfer the case is granted.  The Clerk of Court is respectfully directed to terminate the motions pending at Docket Entries 3 and 19 and transfer this case to the United States District Court for the District of Delaware for automatic referral to the Delaware Bankruptcy Court.  The Court hereby waives the seven-day waiting period set forth in Local Rule 83.1 so that the case may be transferred without delay.

SO ORDERED.

Dated: September 30, 2020
   New York, New York

_____
Ronnie Abrams
United States District Judge